COMMONWEALTH of Pennsylvania, Appellee,

v.

Kevin WILLIAMS, Appellant.

Superior Court of Pennsylvania.

Submitted Aug. 16, 1999.

Filed March 29, 2000.

Sister Rita Murillo, Pittsburgh, for appellant.

Francesco L. Nepa, Asst. Dist. Atty., Pittsburgh, for Commmonwealth, Appellee.

Before CAVANAUGH, LALLY–GREEN and BROSKY, JJ.

BROSKY, J.

¶ 1   There are two questions presented by Appellant, Kevin Williams, in this appeal: 1) whether the search of his vehicle by School District Police Officers was authorized by section 7–778 of the Public School Code, 24 P.S. § 7–778; and 2) whether the search of his vehicle was an unreasonable violation of Article I, Section 8 of the Pennsylvania Constitution, such that the trial court erred in refusing to suppress the physical evidence seized from the vehicle?  Because we conclude that the search of the vehicle and seizure of the weapons from therein was unauthorized by section 7–778 of the Public School Code, we rule that the trial court erred in refusing to suppress the physical evidence seized from the automobile.  Accordingly, we vacate judgment of sentence and remand to the trial court for a new trial.

¶ 2   The facts pertinent to our review are that Robert Fadzen, who is the Chief of the School Police for the City of Pittsburgh School District, was called to the general area of Brashear High School, a City of Pittsburgh School, on September 18, 1997 to investigate possible truant activity.  On a City of Pittsburgh street adjacent to school property, but off school property, Chief Fadzen found two truant students and directed those students to proceed directly to school.  While investigating the truant students, Chief Fadzen had an encounter with a car whose three occupants stopped and looked at him, made a U-turn, gave him the proverbial finger, and left the area.  Chief Fadzen located the car parked on a City of Pittsburgh street a block or two away from where the incident occurred, off school property.  After locating the parked car, Chief Fadzen confronted the vehicle's three occupants, who indicated to him that they were late for school because they had missed the bus.  He instructed them to proceed directly to school, which they did.  Chief Fadzen also notified school personnel and asked that the students be held until the matter could be resolved.

¶ 3 This was not the end of the encounter, however. Chief Fadzen returned to the parked vehicle and peered into it. Inside, the chief saw on the back floor, in plain view, a sawed-off shotgun that was partially wrapped in clothing, and a shotgun shell. City of Pittsburgh Police were called to the scene to investigate. However, without waiting for City Police to arrive, other Pittsburgh School Police who had already arrived at the scene joined Chief Fadzen in opening the car. With the driver's-side door open, the School Police Officers could observe a barrel of a revolver protruding from under the driver's seat, so they looked under the seat, where they recovered two more revolvers. In total, the School Police Officers recovered from the parked car three loaded revolvers in addition to the loaded sawed-off shotgun, all without a warrant and without awaiting the arrival of City of Pittsburgh Police. The School Police turned the weapons over to City Police, who arrived approximately five minutes later.

¶ 4 After Appellant was charged with various weapons offenses, the trial court denied his motion to suppress the physical evidence. The trial judge found that Chief Fadzen's actions, although they occurred outside the school premises, were within the purview of his duties as a School Police Officer and that his observation of the sawed-off shot gun, clearly contraband, was valid under the plain view doctrine. Further, the trial judge found the removal of the guns from the vehicle by School Police Officers was proper. Citing *Commonwealth v. Cass*, 551 Pa. 25, 709 A.2d 350 (1998), and *Commonwealth v. J.B.*, 719 A.2d 1058 (Pa.Super.1998), the trial court stated that there is a two-step analysis for whether the School Police Officers acted properly in conducting a search. First, Chief Fadzen would have to be justified in conducting the search at its inception, and second, the search conducted by the chief must have been reasonably related in scope to Appellant's conduct. The trial court concluded that the chief's search was justified because his plain view observation of the sawed-off shotgun in the back seat of the car from which the three truant students had just emerged gave him reasonable suspicion and actual physical evidence that the students were violating the law. The trial court also reasoned that the search was reasonably related in scope to Appellant's conduct.

¶ 5 The trial judge stated the following: This Court, like the Superior Court, will not tolerate "the presence of drugs, alcohol or weapons *on school property*." This Court is committed, like the Superior Court, to providing all students with a safe learning environment and believes that school officials can and should use reasonable efforts to maintain discipline, order and safety. In the instant case, Officer Fadzen was properly working towards this goal when he removed the guns from the [Appellant's] car so that they could not be used by the students inside or outside of the school.

Trial Court Opinion, 1/7/99, at 7 (emphasis added).

¶ 6 After a non-jury trial, Appellant was convicted[1] of the weapons offenses and sentenced to serve two consecutive prison terms of nine to eighteen months for possession of a firearm by a minor and criminal conspiracy.[2] This appeal followed.

¶ 7 Our standard for reviewing the trial court's ruling on the suppression ruling is as follows:

[W]e must ascertain whether its factual findings are supported by the record and whether the inferences and legal conclusions drawn from those facts are reasonable. Where the defendant chal-

---

1. We note that Appellant, who was seventeen at the time of the offenses, was tried as an adult.

2. Appellant was found guilty of three counts of possession of a firearm by a minor, three counts of carrying a firearm without a license, and criminal conspiracy.

lenges an adverse ruling of the suppression court, we will consider only the evidence for the prosecution and whatever evidence for the defense that remains uncontradicted on the context of the whole record. If there is support on the record, we are bound by the facts as found by the suppression court, and we may reverse that court only if the legal conclusions drawn from these facts are in error.

*Commonwealth v. Petroll,* 558 Pa. 565, 738 A.2d 993, 998 (1999).

¶ 8 We find the decisions in *Cass* and *J.B.* inapposite to the instant scenario because the searches involved in those cases took place on school property. The search involved in *Cass* was a school-wide search of student lockers for the presence of drugs and/or drug paraphernalia by an Erie Police Officer with a dog. A plurality of our Supreme Court in *Cass* concluded that the privacy interest of students within the school environment is limited, entitled to no greater protection under Article I, Section 8 of the Pennsylvania Constitution than that afforded students under the Fourth Amendment to the United States Constitution.

¶ 9 Subsequent to the decision in *Cass*, a panel of this Court in *J.B.* upheld a School Police Officer's search of a school student that had occurred in the school building and which was based upon observations of the School Police Officer of the student made in the building. The panel in *J.B.* held that the School Police Officer's search did not violate the Fourth Amendment's protection against unreasonable searches and seizures, and that the individual search of the student was subject to a reasonable suspicion standard under the Pennsylvania Constitution. Thus, we find that the learned trial judge erred in applying the decisions in *Cass* and *J.B.* to this matter.

¶ 10 Further, we find that the trial judge erred in concluding that Chief Fadzen's actions were within the purview of his duties as a School Police Officer under section 7–778 of the Public School Code, 24 P.S. § 7–778, although they occurred outside the school premises. Chief Fadzen and his fellow School Police Officers were authorized to act under the authority of section 7–778, which provides school districts with the authority to apply for the appointment of School Police Officers by the common pleas court. 24 P.S. § 7–778(a). The common pleas court judge may grant the School Police Officer, so appointed, the power to arrest as provided in section 7–778(c)(2), the authority to issue citations for summary offenses or the authority to detain students until the arrival of local law enforcement, or a combination thereof. 24 P.S. § 7–778(a). In conjunction with the officer's arrest power, section 7–778(c)(2) provides that, if authorized by the court, the School Police Officer may exercise the same powers that are presently or may thereafter be exercised under authority of law or ordinance by municipal police where the school property is located. There is no evidence in this case that Chief Fadzen or any of his fellows acted pursuant to powers granted under section 7–778(c)(2).

¶ 11 Also, under section 7–778(c)(3), a School Police Officer, if authorized by the court, may issue summary citations or detain individuals until local law enforcement is notified. There is no evidence in this matter that Chief Fadzen or any of his fellows acted pursuant to powers granted under section 7–778(c)(3).

¶ 12 Finally, under section 7–778(c)(1), School Police Officers are empowered: "(1) To enforce good order in school buildings, on school buses and on school grounds in their respective school districts." This is the section that the Commonwealth urges provided the officers with authority to search the vehicle and seize the weapons from therein. As an intermediate appellate court, we must follow the rule of statutory construction that, when the words of a statute are clear and free from doubt, the letter of it is not to be

disregarded under the pretext of pursuing its spirit. *Commonwealth v. Heberling*, 451 Pa.Super. 119, 678 A.2d 794, 795 (1996); 1 Pa.C.S.A. § 1921(b). The statute clearly delineates the places at which the School Police Officers may act: in school buildings, on school buses, and on school grounds. Chief Fadzen and his fellow School Police Officers were not in a school building, on a school bus, or on school grounds when they conducted the search and seizure here. Thus, we find that the trial judge erred in concluding that the officers acted within the purview of their statutory authority.

¶ 13 The Dissent would find that, once the officers saw a gun in plain view, section 7–778 provided authority for Chief Fadzen and his fellow School Police Officers to open the vehicle in question, conduct a further search, and seize the guns from the vehicle without awaiting local law enforcement officers. The Dissent urges that the legislative intent behind section 7–778 of the Public School Code is to keep order on the grounds of the school. So, the Dissent postulates, School Police Officers are inherently authorized to act outside the boundaries of the school to do anything that has an arguable nexus to enforcing good order on school grounds. We disagree for several reasons.

¶ 14 We find the reasoning in previously decided cases involving the powers of special police is applicable here. This Court has held that special police officers, such as university campus police and housing authority police, have circumscribed statutory authority to act and seize evidence only in those areas that are specifically delineated in their authorizing statutes. We have held that university campus police officers are limited in authority by the language of section 2416(h) of the Administrative Code, 71 P.S. § 646, to areas "only on the premises of the State ... related colleges and universities." *See Commonwealth v. Croushore*, 703 A.2d 546 (Pa.Super.1997) (reversing judgment of sentence on the holding that a university police

officer lacked authority to stop a motorist for running a red light on a street abutting the university campus). *See also Commonwealth v. Savage*, 403 Pa.Super. 446, 589 A.2d 696, 698 (1991) (holding that a campus police officer lacked authority to make an off-campus arrest for traffic offenses that occurred off campus in the Borough of West Chester, and that seized evidence had to be suppressed).

¶ 15 Moreover, this Court has also held that a housing authority police officer acting pursuant to the Housing Authorities Law, 35 P.S. § 1550(ee), lacked authority to stop an automobile two blocks from the housing authority's property and arrest the occupant for a violation of the Vehicle Code and drug offenses. *Commonwealth v. Brandt*, 456 Pa.Super. 717, 691 A.2d 934, 937 (1997). The statute in *Brandt* provided that the housing authority police had police power authority "with respect to the [housing authority's] property and enforcing order on and adjacent to the grounds and buildings of the Authority." We held in *Brandt* that the housing authority police officer, in acting under the color of state action and seizing the evidence from the appellant, had exceeded his jurisdictional authority and that the evidence turned over to the police had to be suppressed.

¶ 16 The statutory language of section 7–778 of the Public School Code is no less explicit than that in *Croushore, Savage,* and *Brandt.* The statute before us jurisdictionally limits the School Police Officer's authority to "in school buildings, on school buses and on school grounds." Unlike the Dissent, we believe that these decisions are applicable in the instant case in that they demonstrate our consistency in interpreting the legislative grants of authority to special police officers to act and seize evidence only in those areas that are expressed in the statutes. This result avoids any overlap in the powers of special police officers with the powers of municipal police and confines the special police to only the types of enforcement activities for which they are appointed.

¶ 17 We find it inappropriate to engage in judicial legislation to effectuate a policy of fostering gun-free school zones. A policy of helping to enforce good order in our schools, as propounded by the Dissent, is attractive, especially with regard to the presence of weapons. However, as a court, we may not disregard the letter of the statute in favor of fostering gun-free areas surrounding school grounds, since to do so amounts to an exercise of judicial legislation by reading something into the statute that is not there.[3] The position advanced by the Dissent would expand the authority statutorily granted to School Police Officers under section 7–778(c)(1) to encompass the powers of a municipal police officer, as long as there is a nexus to the school.

¶ 18 The "nexus to the school under the totality of the circumstances of the incident" inquiry, put forth by the Dissent to determine whether a School Police Officer is acting within his statutory jurisdiction, is nebulous, and would certainly lead to confusion. This confusion would ensue first in the mind of a School Police Officer in deciding whether he has enough of a nexus to give him statutory authority to act off school grounds, and later in reviewing challenges to acts of School Police Officers for whether a sufficient nexus was present. The effect of such a supposed statutory interpretation would be to foster uncertainty and to mire the trial courts of this Commonwealth and this Court in factual determinations. It is not desirable to create such a burden on School Police Officers and the judicial system, especially where the language of the statute defining School Police Officers' authority to act is explicit.

¶ 19 To support her theory of statutory authority, Judge Lally–Green offers the premise that a School Police Officer must be authorized to act off the grounds of the school, otherwise, a School Police Officer could not arrest a truant student. Further, the Dissent would find that our interpretation of section 7–778 eviscerates the authority of School Police to act with regard to truant students who are off school premises. The Dissent overlooks the section of the Public School Code set forth at 24 P.S. § 13–1341.

¶ 20 Section 13–1341 provides that school districts may employ attendance officers, or home and school visitors, whose duties shall be to enforce the provisions of the Public School Code regarding compulsory attendance. These "truant officers" have full police power to arrest or apprehend, without a warrant, any child who fails to attend school, or who is disorderly on his way to or from school in addition to the duties imposed on them by the Public School Code. School Police Officers are also granted this authority by section 13–1341(c). This section provides: "State, municipal, port authority, transit authority, housing authority and school police officers shall have the same arrest powers as attendance officers or home and school visitors." 24 P.S. § 13–1341(c).

¶ 21 Again, the Dissent overlooks the question of *where* a School Police Officer is statutorily authorized to act with regard to a student who is truant or disorderly on his way to or from school. As can be inferred from section 13–1341, there are a number of special officers who are authorized to arrest a truant student on his way to or from school, and this duty does not rest exclusively with a School Police Officer. To date, the question of whether a School Police Officer (or any other officer listed in section 13–1341(c)) is statutorily authorized to take action when a truant student is not on school premises or on a school bus has not been addressed by the appellate courts of this Commonwealth. Nevertheless, we find nothing in the au-

---

**3.** As Judge Wright of this Court once astutely observed, quoting Lord Bacon, the function of judges is *jus dicere* (to declare or decide the law), not *jus dare* (to give or make the law).

*Rose Township v. Hollobaugh*, 179 Pa.Super. 284, 116 A.2d 323 (1955) (Wright, J., dissenting).

thority granted to a School Police Officer by section 13–1341 that would permit such an officer to conduct a search and seizure of a vehicle that is not currently occupied by truant students and is parked off the premises of the school.

¶ 22 For School Police Officers to have the authority of municipal police officers, they must have been authorized pursuant to section 7–778 of the Public School Code. The School Police Officers in this matter were not so authorized, and this Court may not essentially circumvent the application procedure contemplated by section 7–778. The result reached by the Dissent would have the effect of allowing persons who are not municipal police officers to search and seize a person's property and turn over the fruits of the search to police for use in prosecution of the defendant. To endorse such a procedure is to allow police to benefit without their having properly obtained a warrant and in the absence of exigent circumstances.[4]

¶ 23 Although a reading of section 7–778(c)(1) as authorizing School Police Officers to enforce good order on school grounds by acting off school grounds is attractive from a policy standpoint, this Court cannot engage in what would amount to judicial legislation. While the policy espoused by Judge Lally–Green in her Dissenting Opinion is admirable, we are left with the restrictive powers granted School Police Officers by the Legislature in section 7–778 unless and until the Legislature sees fit to expand the statutory grant of authority to them. We are constrained to interpret the statute as written by the Legislature. So doing, we hold that the School Police Officers in this matter acted without authority when they opened the vehicle and searched its interior, seizing the weapons in question and turning them over to City Police. The evidence was inappropriately seized under color of

state law here and should have been suppressed, as it was in *Savage* and *Brandt*.

▮▮▮ ¶ 24 Given our conclusion that the search was unauthorized by section 7–778, we need not reach the question of the constitutionality of the search and seizure under Article I, Section 8. The Dissent's analysis of whether the search was proper under the plain view doctrine is unnecessary. Having failed to raise his argument concerning Article I, Section 8 until the matter reached this Court, Appellant has waived this issue. *See Commonwealth v. Rosa*, 734 A.2d 412, 420 (Pa.Super.1999). Moreover, although the conclusion of Appellant's brief mentions the Fourth Amendment, Appellant fails to discuss the validity of the search under the Fourth Amendment. Thus, this issue is also waived. *Commonwealth v. Zewe*, 444 Pa.Super. 17, 663 A.2d 195, 199 (1995) (finding an issue waived where brief failed to provide a citation to pertinent case law).

¶ 25 Accordingly, this Court must vacate judgment of sentence, and remand to the trial court for a new trial in accordance with this Opinion.

¶ 26 Judgment of sentence vacated; case remanded to the trial court for a new trial in accordance with this Opinion. Jurisdiction relinquished.

¶ 27 LALLY–GREEN, J., files a Dissenting Opinion.

LALLY–GREEN, J., dissenting:

¶ 1 I respectfully dissent. I would hold that 24 P.S. § 7–778 does not preclude school police officers from taking action away from school grounds so long as such action, in the totality of the circumstances, has a demonstrated nexus to the officer's statutory authority. I would further hold that under the circumstances of this case, the Pittsburgh School Police were authorized to open the vehicle and to seize the

---

4. Although the Commonwealth contends that there were exigent circumstances here, we disagree, as the Commonwealth even concedes that Chief Fadzen had arranged with school personnel for the students who had occupied the vehicle to be held pending a resolution of the matter.

weapons found therein. Finally, I would hold that no constitutional violation took place because the weapons were properly seized under the plain view doctrine. Accordingly, I would affirm the judgment of sentence.

¶ 2 The primary question in this case is whether § 7–778 authorized the Pittsburgh School Police to act as they did. Our goal is to ascertain and effectuate the intent of the Legislature. 1 Pa.C.S.A. § 1921(a). Section 7–778 reads in pertinent part as follows:

### § 7–778. School police officers

(a) Any school district may apply to any judge of the court of common pleas of the county within which the school district is situated to appoint such person or persons as the board of directors of the school district may designate as school police officer for said school district. The judge, upon such application, may appoint such person, or so many of them as he may deem proper, to be such school police officer and shall note the fact of such appointment to be entered upon the records of the court. The judge may, at the request of the school district, grant the school police officer the power to arrest as provided in subsection (c)(2), the authority to issue citations for summary offenses or the authority to detain students until the arrival of local law enforcement, or any combination thereof.

\* \* \*

(c) Such school police officer so appointed shall severally possess and exercise all of the following powers and duties:

(1) **To enforce good order in school buildings, on school buses and on school grounds in their respective school districts.**

24 P.S. § 7–778(a), (c)(1) (emphasis added).[5]

¶ 3 It is undisputed that the school police officers were not in a school building, on a school bus, or on school grounds when they seized the weapons. The Majority reasons that by authorizing the officers to enforce good order **on** school property, the Legislature has implied that those officers cannot do so when they are **away** from school property. On the other hand, the statute can be read to authorize a school officer to act away from school property, so long as the officer is, in doing so, "enforcing good order" on school property. Unlike the Majority, I am not convinced that the statute clearly and explicitly delineates the geographic scope of a school police officer's authority.

¶ 4 Where the words of a statute are not explicit, the Legislature's intention may be ascertained by considering, *inter alia* : (1) the object to be attained; (2) the mischief to be remedied; (3) the consequences of a particular interpretation; and (4) the former law, including other statutes on the same or similar subjects. 1 Pa.C.S.A. § 1921(c). We presume that the Legislature did not intend a result that is absurd, unreasonable, or impossible to execute. 1 Pa.C.S.A. § 1922(1); *Eritano v. Commonwealth*, 547 Pa. 372, 377, 690 A.2d 705, 708 (1997).

¶ 5 The Legislature's intent respecting the relevant part of § 7–778 is clear. First, the plain language of § 7–778 indicates that the Legislature sought to provide a means for enforcing good order and safety on school property. Second, the mischief to be remedied is disorder and

---

**5.** As the Majority notes, subsections (c)(2) and (c)(3) are not at issue in this case. These subsections give school police officers the following powers:

(2) If authorized by the court, to exercise the same powers as are now or may hereafter be exercised under authority of law or ordinance by the police of the municipality wherein the school property is located.

(3) If authorized by the court, to issue summary citations or to detain individuals until local law enforcement is notified.

24 P.S. § 7–778(c)(2), (c)(3).

danger to persons and property on school grounds.

¶ 6 Third, the consequence of the Majority's interpretation is that good order could be destroyed by limiting the officer's authority to the geographic boundaries of school property. As the Majority recognizes, the danger to life (and certainly good order on school grounds), is significant when guns, knives or other weapons are used from beyond school property to injure students or teachers who are on school property. Similarly, under the Majority's interpretation, prohibited drugs, so destructive to the youth of this Commonwealth, could easily be sold immediately outside the borders of the school grounds to school children. Thus, the purpose of the statute, to "enforce good order in school buildings ... and on school grounds" is not served by the Majority's restricted interpretation that the statute means only the geographic limits of the school grounds. As our Supreme Court said recently:

The myriad of interests at issue include the physical safety of the school students, teachers, administrators and other employees, the public concern of eliminating violence in the communities in general and the schools in specific, and the need to maintain schools as centers of learning free of fear for personal safety.... Simply stated, guns, knives, or other weapons, have no place in the public school setting.

*In the Interest of F.B.*, 555 Pa. 661, 672–673, 726 A.2d 361, 367 (1999); *see also Commonwealth v. Davis*, 734 A.2d 879, 883 (Pa.Super.1999) (in order to make schools safe from crime, Pennsylvania law imposes higher penalties for drug sales occurring 1,000 feet from a school; moreover, the distance is measured from the point on school property which is closest to the crime).

¶ 7 Fourth, we look to statutes where similar language may exist and examine how each of these statutes has been interpreted. The relevant statutes are found in cases dealing with campus police or public housing police. In *Commonwealth v. Croushore*, 703 A.2d 546 (Pa.Super.1997), a university police officer stopped a motorist for running a red light on a street abutting the university campus. This Court held that the officer exceeded his authority under 71 P.S. § 646 which states, in pertinent part, that campus police "shall exercise their powers and perform their duties **only on the premises of the State colleges** ... by or for which they are employed." *Id.* at 547. In other words, the officer did not have the authority to arrest for a traffic offense where he did.

¶ 8 In *Commonwealth v. Savage*, 403 Pa.Super. 446, 589 A.2d 696, 698 (1991), *appeal denied*, 529 Pa. 633, 600 A.2d 953 (1991), a campus police officer arrested defendant off campus for driving under the influence of alcohol. The officer apprehended the defendant after he had run a red light and had driven his truck the wrong way down a one-way street. Both of these traffic offenses took place on streets which were off campus. The Court held that the officer had exceeded his authority under § 646 to arrest where he did.

¶ 9 Finally, in *Commonwealth v. Brandt*, 456 Pa.Super. 717, 691 A.2d 934, 937 (1997), *appeal denied*, 549 Pa. 695, 700 A.2d 437 (1997), a Pittsburgh Housing Authority police officer stopped an automobile two blocks from the housing authority's property and made a warrantless arrest for violation of the Motor Vehicle Code and the drug laws. Pursuant to 35 P.S. § 1550, a Housing Authority officer has police powers "with respect to the [Housing Authority's] property **and enforcing order on and adjacent to the grounds and buildings** of the Authority." *Id.* (emphasis in *Brandt*). The court held that the housing authority officer did not have jurisdiction to arrest two blocks away from housing authority property.

¶ 10 While I recognize that similarities exist between the statute in this case and the statutes in the cases discussed above, I

am not convinced that these similarities compel the same result. In *Croushore, Savage, and Brandt*, the officers had the same rights, powers, and duties of city police officers, provided they acted within their territorial limits and completed appropriate training. *Croushore*, 703 A.2d at 546, citing 71 P.S. § 646(h); *Savage*, 589 A.2d at 697 (same); *Brandt*, 691 A.2d at 934 (citing 35 P.S. § 1550(ee)). This fact suggests that campus officers and housing authority officers act as a supplemental city police force to patrol specific areas. It is understandable that the authority of campus officers and housing authority officers should ordinarily be limited to fixed territorial limits. If a criminal offense takes place away from campus, or away from the housing authority's grounds and buildings, city police are available to enforce the law.

¶ 11 In contrast, school police officers are not simply a supplemental city police force. They do not patrol campuses and housing authority property, where adults live and work. Nor is their duty limited to enforcing the criminal law. Rather, their broad duty is to enforce good order in the unique environment of elementary schools and high schools. This duty will necessarily involve acting away from school property (for example, in truancy situations). School police are uniquely equipped to do this duty; city police are not. Unlike the situation with campuses and public housing, the duty of enforcing good order "on school property" (when physically away from school property) cannot and does not lie exclusively with city police.

¶ 12 In light of the above, I would conclude that the legislative intent is to keep order on the grounds of the school, and to do so, school police have to perform some of their duties, such as finding truant students, away from the territorial boundaries of the school. The Majority's interpretation of § 7–778 would eviscerate this basic function of school police. I would hold that a school police officer is not automatically divested of authority when he steps off school property.

¶ 13 Similarly, I would conclude that the critical inquiry is whether the officer was performing his duty of keeping good order on school grounds when the officer did what he did. In other words, was there a demonstrable nexus among the incident, the location, the people involved, the school police and the school itself? The analysis would be one of the totality of the circumstances, including but not limited to the following. Did the school officer observe truant students? When the officer observed the students, were they in a vehicle within the officer's school district, albeit not on the school grounds? Did the students park the observed vehicle near the school? Did the officer observe where the vehicle was parked? Other relevant circumstances such as the behavior of the students could be considered in this totality of the circumstances analysis.

¶ 14 Turning to the facts of the case, the record reveals that Chief Fadzen saw three students drive away from Brashear High School after one of those students made an obscene gesture. Chief Fadzen later found the students' vehicle parked on a public street one or two blocks from the school. After looking in the window, he saw a sawed-off shotgun and a shotgun shell in plain view. In the course of seizing that weapon from the unlocked vehicle, the officers found three handguns. These weapons, found in a student's unlocked vehicle one to two blocks from a high school, constituted a substantial threat to good order on school property. The students possessed these weapons immediately before entering the high school, and would have regained possession thereof **whenever** they departed school if the officers' actions had not intervened. By seizing the weapons and removing that threat, the school police officers acted to enforce good order on school property. Accordingly, I would hold that the trial court did not abuse its discretion in holding that the

school police had authority to act under § 7–778.

¶ 15 Next, I would hold that the plain view doctrine justifies the seizure of all of the weapons found in the vehicle. Generally, a seizure conducted without a warrant is presumed to be unreasonable under both the United States Constitution and the Pennsylvania Constitution. *Commonwealth v. Petroll*, 558 Pa. 565, 738 A.2d 993, 998 (1999). "A search without a warrant may be proper where an exception applies and the police have probable cause to believe a crime has been or is being committed." *Id.* at 999. The plain view doctrine is an exception to the warrant requirement. *Id.* A plain view observation "is not a search within the meaning of the Fourth Amendment and no warrant is required." *Commonwealth v. Weik*, 360 Pa.Super. 560, 521 A.2d 44, 45 (1987).

¶ 16 Our Supreme Court recently set forth the parameters of the plain view doctrine as follows:

> If a police officer views an object from a lawful vantage point, and the incriminating nature of the object is immediately apparent to the officer, a warrantless seizure of the object is justified. *Commonwealth v. Ellis*, 541 Pa. 285, 297, 662 A.2d 1043, 1049 (1995). There can be no expectation of privacy in an object in plain view. To judge whether the incriminating nature of an object was immediately apparent to the police officer, reviewing courts must consider the totality of the circumstances.[6]

*Petroll*, 738 A.2d at 999 (citation omitted).

¶ 17 Police may not justify a seizure under the plain view doctrine if illegal conduct brought the item into plain view. *Commonwealth v. Graham*, 554 Pa. 472, 481, 721 A.2d 1075, 1079 (1998); *see also*

*Brandt*, 691 A.2d at 938 n. 5 (officer did not have lawful right of access to contraband in plain view on passenger seat of vehicle when officer acted beyond his authority in stopping the vehicle). In *Commonwealth v. Milyak*, 508 Pa. 2, 6, 493 A.2d 1346, 1348 (1985), our Supreme Court applied these principles to a police officer's observation of the "plainly viewable interior of a vehicle":

> There is no reason a police officer should be precluded from observing as an officer what would be entirely visible to him as a private citizen. There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers. In short, the conduct that enabled the officer to observe the interior of the car and of the open glove compartment was not a search within the meaning of the Fourth Amendment.

*Id.*, quoting *Texas v. Brown*, 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality) (brackets and ellipses omitted). *Milyak* cited *Colorado v. Bannister*, 449 U.S. 1, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980) for the proposition that police may seize evidence from a vehicle without a warrant "based on plain view **alone** without regard to any exigent circumstances" under the United States Constitution. *Id.* at 9, 493 A.2d at 1350; *see also Commonwealth v. Merkt*, 411 Pa.Super. 127, 600 A.2d 1297, 1299 (1992) (authorizing plain view seizure of weapon from auto without reference to exigent circumstances); *Commonwealth v. Burton*, 292 Pa.Super. 73, 436 A.2d 1010, 1013 (1982) (authorizing plain view seizure of marijuana from auto without reference to exigent circumstances).

---

6. "Immediately apparent" means that the officer has probable cause to believe, without any further investigation, that the item is contraband or incriminating evidence. *Ellis*, 541 Pa. at 297, 662 A.2d at 1049 (1995). The standard for evaluating whether probable cause exists is the "totality of the circumstances" test. The court must determine whether the facts and circumstances existing at the time of the seizure would have led a person of reasonable caution to believe that the evidence in question was incriminating. *Id.* at 298, 662 A.2d at 1049–1050.

¶ 18 The trial court found that the sawed-off shotgun was contraband, found in plain view. Trial Court Opinion, 1/7/99, at 7. The record supports this finding. The officers saw the shotgun and a shell casing in plain view through an untinted window of an automobile parked on a public street. Moreover, as discussed above, the school police were acting within the scope of their authority. For these reasons, the police viewed the evidence from a lawful vantage point. Appellant does not dispute that the incriminating nature of the evidence was immediately apparent. Thus, the immediate seizure of the shotgun and shell casing was justified under the plain view exception, regardless of whether exigent circumstances existed. *Milyak*, 508 Pa. at 9, 493 A.2d at 1350.

¶ 19 In the course of opening the vehicle's door to seize the shotgun in plain view, Chief Fadzen and Officer Polin observed other guns in plain view. Chief Fadzen noticed a revolver protruding from underneath the front seat; Officer Pollock found additional weapons projecting under the passenger seat. Again, these items were lawfully seized. First, the officers saw these revolvers from a lawful vantage point. In the course of seizing the shotgun, they noticed the revolvers in plain view under the driver's seat and passenger's seat. Next, the incriminating nature of the weapons was immediately apparent. For these reasons, I would hold that the weapons were properly seized, and that no constitutional violation took place.

¶ 20 For these reasons, I respectfully dissent.