SMITH, Circuit Judge,
concurring.
I join Chief Judge McKee’s well-reasoned majority opinion in its entirety. I write separately only to explain the limited circumstances under which I believe we may overrule one of our prior en banc decisions.
“Stare decisis should be more than a fine-sounding phrase.” Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co., 429 U.S. 363, 394, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977) (Marshall, J„ dissenting). Yet it is nothing more than that if it does not require us, in the ordinary course, to adhere to a precedent with which we disagree. And even sitting en banc, we do not conduct a plenary re-examination of our prior decisions; we instead remain constrained by our precedent “to the degree counseled by principles of stare deci-sis.” Bolden v. Se. Pa. Transp. Auth., 953 F.2d 807, 813 (3d Cir.1991) (en banc). Indeed, “even in constitutional cases” such as this one, the doctrine of stare decisis “carries such persuasive force” that departing from it has “always required” some “special justification.” Arizona v. Rumsey, 467 U.S. 203, 212, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984).
According to the Supreme Court, those justifications must be nothing short of “exceptional.”[1] Randall v. Sorrell, 548 *180 U.S. 230, 244, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (quoting Rumsey, 467 U.S. at 212, 104 S.Ct. 2305). If its precedent’s reasoning was clearly wrong, then stare decisis loses some (though not all) of its force. See Dickerson v. United States, 530 U.S. 428, 443, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (“Whether or not we would agree with Miranda’s reasoning and its resulting rule[ ] were we addressing the issue in the first instance, the principles of stare decisis weigh heavily against overruling it now.”); see also McDonald v. City of Chi, III., — U.S.-, 130 S.Ct. 3020, 3050, 177 L.Ed.2d 894 (2010) (Scalia, J., concurring) (“Despite my misgivings about Substantive Due Process as an original matter, I have acquiesced in the Court’s incorporation of certain guarantees in the Bill of Rights because it is both long established and narrowly limited.” (quotation marks and citation omitted)). Perhaps a prior case has become unworkable — that is, newly discovered facts have undermined the case’s reasoning, subsequent legal developments have unmoored the case from its doctrinal anchors, or “experience has [otherwise] pointed up the precedent’s shortcomings.” Pearson v. Callahan, 555 U.S. 223, 233, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 887-88, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007). And if the precedent is particularly recent and has not generated any serious reliance interests, the rigging controlling the sails of stare decisis carries additional slack. See, e.g., Citizens United v. FEC, 558 U.S. 310, 130 S.Ct. 876, 912-13, 175 L.Ed.2d 753 (2010); Montego v. Louisiana, 556 U.S. 778, 793, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009).
As other courts of appeals have concluded, these same considerations should guide our own stare decisis analysis. United States v. Burwell, 690 F.3d 500, 504 (D.C.Cir.2012) (en banc) (applying the Supreme Court’s stare decisis factors in deciding whether to overrule a previous case); United States v. Sykes, 598 F.3d 334, 338 (7th Cir.2010) (same); United States v. Heredia, 483 F.3d 913, 918-19 (9th Cir.2007) (en banc) (same); Shi Liang Lin v. U.S. Dep’t of Justice, 494 F.3d 296, 310 (2d Cir.2007) (en banc) (same); Glazner v. Glazner, 347 F.3d 1212, 1216 (11th Cir.2003) (en banc) (same); Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 234 F.3d 558, 575 (Fed.Cir.2000) (en banc) (same), overruled on other grounds by 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002); Stewart v. Dutra Constr. Co., Inc., 230 F.3d 461, 467 (1st Cir.2000) (same), overruled on other grounds by 543 U.S. 481, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005); Coats v. Penrod Drilling Corp., 61 F.3d 1113, 1137-38 (5th Cir.1995) (en banc) (same); McKinney v. Pate, 20 F.3d 1550, 1565 n. 21 (11th Cir.1994) (en banc) (same).
None of these special justifications are present here.
*181 Middle Bucks’s interpretation of the Supreme Court’s decision in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 196-97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), was correct at the time it was decided. DeShaney held that substantive due process does not confer a right to state protection except when the state affirmatively acts to restrict a person’s “freedom to act on his own behalf, through imprisonment, institutionalization, or other similar restraint of personal liberty.” Id. at 200, 109 S.Ct. 998. In D.R. v. Middle Bucks Area Vocational Technical School, we interpreted “other similar restraint of personal liberty” to require total and involuntary state custody with no access to private assistance. 972 F.2d 1364, 1371 (3d Cir.1992) (en banc) (“Institutionalized persons are wholly dependent upon the state for food, shelter, clothing, and safety. It is not within their power to provide for themselves, nor are they given the opportunity to seek outside help to meet their basic needs. Obviously, they are not free to leave.”). We then concluded that, unlike prisoners and institutionalized individuals, students are not rendered totally dependent on the state just because the state requires them to attend school. Id.
The reasonableness of that interpretation of DeShaney’s state-restraint requirement is self-evident. To be sure, the Middle Bucks dissent viewed DeShaney’s state-restraint requirement more expansively to reach not only custodial restraints such as incarceration and involuntary institutionalization but also situations in which an individual faces “substantial [state] compulsion.” Id. at 1379 (Sloviter, J., dissenting).. But compared to incarceration and institutionalization, substantial state compulsion is not a “similar restraint of personal liberty”: a state can substantially compel a person without “so restraining] [his] liberty that it renders him unable to care for himself’ while “failing] to provide for his basic human needs.” DeShaney, 489 U.S. at 200, 109 S.Ct. 998. Even if, as the majority notes, “the Supreme Court’s jurisprudence [at the time of Middle Bucks ] allowed room to debate this issue,” Majority Op. at 169, the very point of stare decisis is to forbid us from revisiting a debate every time there are reasonable arguments to be made on both sides. Agostini v. Felton, 521 U.S. 203, 235, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (explaining that stare decisis reflects “a policy judgment that ‘in most matters it is more important that the applicable rule of law be settled than that it be settled right’ ” (quoting Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 406, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandéis, J., concurring))). Middle Bucks’s reasoning was not so clearly wrong that we may — or should — cast it aside.
And that is especially true when one considers the limited nature of en banc review. En banc review is primarily reserved for correcting and maintaining consistency in panel decisions involving difficult and important questions of law. Fed. R.App. P. 35(a); see, e.g., United States v. Games-Perez, 695 F.3d 1104, 1124 (10th Cir.2012) (Gorsuch, J., dissenting from the denial of rehearing en banc) (“[S]urely it is uncontroversial to suggest that the point of the en banc process, the very reason for its existence, is to correct grave errors in panel precedents when they become apparent....” (emphasis added)); Pfizer, Inc. v. Apotex, Inc., 488 F.3d 1377, 1380-81 (Fed.Cir.2007) (Newman, J., dissenting from the denial of rehearing en banc) (“The function of en banc hearings ... is not only to eliminate intra-circuit conflicts, but also to correct and deter panel opinions that are pretty clearly wrong.” (emphasis added) (internal quotation marks and citations omitted)). We do not sit en *182 banc to “reopen settled issues which have already been given en banc treatment” absent intervening developments undermining our earlier decision. Igartua v. United States, 654 F.3d 99, 100 (1st Cir.2011) (Lynch, J., concurring in the denial of en banc review); see also McKinney, 20 F.3d at 1565 n. 21 (“[T]his is the first time this court sitting en banc has addressed this issue; thus, the implications of stare decisis are less weighty than if we were overturning a precedent established by the court en banc”). Absent such exceptional intervening developments, the “essence of stare decisis is that the mere existence of [Middle Bucks ] becomes a reason for adhering to [its] holding[] in subsequent cases.” United States v. Reyes-Hernandez, 624 F.3d 405, 412 (7th Cir.2010) (internal quotation marks and citations omitted).
Intervening legal and factual developments have only strengthened our decision in Middle Bucks. Since then, the Supreme Court has sharply circumscribed substantive due process, limiting its protections to only those “carefully described,” unenumerated rights that are “ ‘deeply rooted in this Nation’s history and tradition’ ” and “ ‘implicit in the concept of ordered liberty.’ ” Chavez v. Martinez, 538 U.S. 760, 775, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (quoting Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)); see also Dist. Att’y’s Office for Third Judicial Disk v. Osborne, 557 U.S. 52, 69, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009) (refusing to recognize a liberty interest protected by due process unless it is “so rooted in the traditions and conscience of our people as to be ranked as fundamental” (internal quotation marks and citation omitted)).
It can hardly be said that “neither liberty nor justice would exist,” id., by forgoing a judicially enforceable right against the states to protect students from private harm. History points the other way. Under the doctrine of in loco parentis, states have long permitted schools to exercise control over students on the theory that parents delegated part of their parental authority to the schools during the school day. See, e.g., 24 Pa. Stat. § 13-1317. “[S]choolteachers and administrators had almost complete discretion to establish and enforce the rules they believed were necessary to maintain control over their classrooms” — discretion that the “judiciary was reluctant to interfere” with. Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 383, 398, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009) (Thomas, J., concurring) (internal quotations and citations omitted); see also D.O.F. v. Lewisburg Area Sch. Dist. Bd. of Sch. Dirs., 868 A.2d 28, 33 (Pa. Commw.Ct.2004) (noting that “local school boards have broad discretion in determining school disciplinary policy” and that a court may not act as “a ‘super’ school board” by “substituting its own judgment for that of the school district”); Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 481, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (“No single tradition in public education is more deeply rooted than local control over the operation of schools.... ” (quoting Milliken v. Bradley, 418 U.S. 717, 741, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974))). Faced with a tradition that once permitted almost no judicial limitations on schools’ disciplinary authority, id. at 461, 102 S.Ct. 3187, I cannot conclude that substantive due process enshrines the opposite — a right to judicial intervention in school disciplinary decisions. The “mere novelty of such a claim is reason enough to doubt that ‘substantive due process’ sustains it.” Osborne, 557 U.S. at 72, 129 S.Ct. 2308 (internal quotation marks and citation omitted).
Just as the constriction of substantive due process has bolstered Middle Bucks’s vitality, there are no new factual develop *183 ments that undermine the decision’s reasoning. To be sure, a body of intervening research has revealed that school bullying undeniably causes serious harm to its victims. This evidence, however, has no bearing on Middle Bucks’s two-part rationale. First, the severity of harm caused by bullying is irrelevant to Middle Bucks’s constitutional judgment that substantive due process is not triggered by substantial state compulsion. See, e.g., Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 860, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (acknowledging that “time has overtaken some of [Roe v. Wade’s, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)] factual assumptions” about when a fetus is viable and when abortions are safe for the mother, but concluding that these developments “have no bearing” on the “soundness or unsoundness of [iüoe’s] constitutional judgment” that “viability marks the earliest point at which the State’s interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions”). After all, substantive due process “does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm.” Cnty. of Sacramento v. Lewis, 523 U.S. 833, 848, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).
Second, empirical revelations about bullying’s effects do not change Middle Bucks’s factual judgment that compulsory education laws fall short of making students wholly dependent on the state. If anything, students are subjected to less state compulsion today than at the time of Middle Bucks. With increased availability of private schooling, homeschooling, private tutoring, online and distance education, and charter schools, modern families have more options to satisfy the compulsory school laws. And school authority over students has significantly eroded in favor of parental control and private sources of assistance. See New Jersey v. T.L.O., 469 U.S. 325, 336, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (“More generally, the Court has recognized that the concept of parental delegation as a source of school authority is not entirely consonant with compulsory education laws. Today’s public school officials do not merely exercise authority voluntarily conferred on them by individual parents; rather, they act in furtherance of publicly mandated educational and disciplinary policies.” (internal quotation marks and citations omitted)). The most serious disciplinary problems are handled by police officers and the legal system, not school administrators and the disciplinary code. See, e.g., In re R.H., 568 Pa. 1, 791 A.2d 331 (2002); Commonwealth v. Williams, 749 A.2d 957 (Pa.Super.Ct.2000). States no longer permit schools to inflict corporal punishment. See, e.g., 22 Pa.Code § 12.5(a). And so forth.
Students these days also have the protection of state tort laws that did not exist when we decided Middle Bucks. Nearly every state has enacted anti-bullying laws since we decided Middle Bucks, showing that our decision has not prevented states from experimenting with their own solutions to the problems of bullying. There is “no institutional need to send judges off on [a] ‘mission-almost-impossible’ ” to prevent and cure the effects of school bullying when legislators “are able ‘to amass the stuff of actual experience and cull conclusions from it.’ ” McDonald, 130 S.Ct. at 3128 (Breyer, J., dissenting) (quoting United States v. Gainey, 380 U.S. 63, 67, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965)). “To suddenly constitutionalize this area would short-circuit what looks to be a prompt and considered legislative response.” Osborne, 557 U.S. at 73, 129 S.Ct. 2308. If the people of Pennsylvania, Delaware, New Jersey and the Virgin Islands want to *184 expose their schools to greater liability for inaction, or if they desire different solutions to the problem that all on this en banc court agree bullying to be, it is their prerogative to do so. Middle Bucks does not stand in their way.
In fact, Pennsylvania, like many other states, has deliberately chosen not to make schools and other local government agencies liable for claims like the Morrows’. Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. Cons.Stat. §§ 8541-42; see Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir.2006) (per curiam) (explaining that local state agencies, including school districts, are “given broad tort immunity” under the Pennsylvania Political Subdivision Tort Claims Act); Tackett v. Pine Richland Sch. Dist., 793 A.2d 1022, 1025 (Pa.Commw.Ct.2002) (holding that the Pennsylvania Political Subdivision Tort Claims Act immunized a school district from liability where a teacher’s alleged failure to supervise students’ chemistry experiment caused an explosion and severely burned a student); Auerbach v. Council Rock Sch. Dist., 74 Pa.Cmwlth. 507, 459 A.2d 1376, 1378 (1983) (holding that the Political Subdivision Tort Claims Act immunized a school district from liability for student-on-student injuries, even if school district allegedly failed to protect the victim or supervise the attacker); Husser v. Sch. Dist. of Pittsburgh, 425 Pa. 249, 228 A.2d 910, 910-11 (1967) (holding that a school district was entitled to governmental immunity for a student’s on-campus mugging even if school officials knew of “similar criminal acts [that had] occurred with great frequency ... in the months immediately prior to the attack” and took no precautionary measures). And of course, state law usually provides victims with the ability to sue and recover from bullies who assault, inflict emotional distress on, or commit other torts against fellow students and from the parents whose negligent care allow the bullies to do so. See Restatement (Second) of Torts §§ 283A (discussing children’s tort liability), 316 (discussing a parent’s tort liability for negligently controlling his child); see, e.g., Condel v. Savo, 350 Pa. 350, 39 A.2d 51, 53 (1944) (permitting a tort action against parents who “kn[e]w of the habit of their child of striking other children with sticks” and took “no steps to correct, or restrain” the child).
Lastly, even though Middle Bucks is only two decades old, schools have come to rely on it in developing their personnel and behavioral policies. Schools have long operated under a regime in which they have no affirmative federal duty to protect students from private violence during the school day. There is no reason to upset these expectations by imposing an amorphous, judicially created standard that raises more questions than it answers— especially when states have proven themselves capable of addressing the problem of bullying. Osborne, 557 U.S. at 74, 129 S.Ct. 2308 (“It is hard to imagine what tools federal courts would use to answer [such questions].... [T]here is no reason to suspect that their answers to these questions would be any better than those of state courts and legislatures, and good reason to suspect the opposite.”); McDonald, 130 S.Ct. at 3101 (Stevens, J., dissenting) (“Another key constraint on substantive due process analysis is respect for the democratic process. If a particular liberty interest is already being given careful consideration in, and subjected to ongoing calibration by, the States, judicial enforcement may not be appropriate.”). Abruptly reversing course would require precisely the sort of “extensive legislative response” that stare decisis aims to avoid. Hilton v. S.C. Pub. Rys. Comm’n, 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) (noting that stare decisis “has added *185 force” when the legislature has relied on a previous decision in such a way that overruling that decision would “require an extensive legislative response”).
It comes as no surprise, then, that Middle Bucks is no “legal anomaly” deserving of abandonment. Randall, 548 U.S. at 244, 126 S.Ct. 2479. Aside from the Second and D.C. Circuits, which have not considered the issue, all other courts of appeals have held that compulsory school attendance, coupled with schools’ authority over their students, does not trigger the protections of substantive due process. Doe v. Covington Cnty. Sch. Dist., 675 F.3d 849, 858 (5th Cir.2012) (en banc); Patel v. Kent Sch. Dist., 648 F.3d 965, 968-69, 972-74 (9th Cir.2011); Stevenson v. Martin Cnty. Bd. of Educ., 3 Fed.Appx. 25, 27, 30-31 (4th Cir.2001); Hasenfus v. LaJeunesse, 175 F.3d 68, 69-72 (1st Cir. 1999); Wyke v. Polk Cnty. Sch. Bd., 129 F.3d 560, 563, 568-70 (11th Cir.1997); Sargi v. Kent City Bd. of Educ., 70 F.3d 907, 911 (6th Cir.1995); Dorothy J. v. Little Rock Sch. Dist., 7 F.3d 729, 731-34 (8th Cir.1993) (involving an intellectually disabled high school boy assaulted by another intellectually disabled student); Maldonado v. Josey, 975 F.2d 727, 728, 729-33 (10th Cir.1992); J.O. v. Alton Cmty. Unit Sch. Dist. 11, 909 F.2d 267, 268, 272-73 (7th Cir.1990). It is “rarely appropriate to overrule circuit precedent just to move from one side of the conflict to another,” United States v. Corner, 598 F.3d 411, 414 (7th Cir.2010) (en banc), and no “compelling basis” warrants our creating a conflict here where none exists, Wagner v. Penn-West Farm Credit, ACA, 109 F.3d 909, 912 (3d Cir.1997) (“In light of such an array of [unanimous] precedent [from seven other courts of appeals], we would require a compelling basis to hold otherwise before effecting a circuit split.”); Butler Cnty. Mem’l Hosp. v. Heckler, 780 F.2d 352, 357 (3d Cir.1985) (“[T]his Court should be reluctant to contradict the unanimous position of other circuits.”).
In short, nothing convinces me that “adherence to [Middle Bucks ] puts us on a course that is sure error.” Citizens United, 130 S.Ct. at 911-12. Departing from Middle Bucks would create a circuit split in exchange for forsaking the Supreme Court’s repeated reluctance against expanding substantive due process. See NASA v. Nelson, — U.S. --, 131 S.Ct. 746, 756 n. 10, 178 L.Ed.2d 667 (2011). That, to me, is a lose-lose proposition.

. This is not to say that courts never encounter longstanding precedent that must be consigned to the dustbin of history. The clearest example is Plessy v. Ferguson. In Plessy, the Supreme Court concluded that state-mandated racial segregation in educational facilities could satisfy equal protection as long as the facilities were physically equivalent. Plessy v. Ferguson, 163 U.S. 537, 551, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). The Court did so largely because it rejected the argument that enforced segregation laws were intended to "stamp[ ] [blacks] with a badge of inferiority.” Id. The next sixty years of experience, however, directly disproved this premise, showing that separate-but-equal facilities nonetheless had the effect of creating unequal educational opportunities based on race. Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan., 347 U.S. 483, 493-95, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, this finding is amply supported by modern authority.”). Such experience justified — indeed, required — the Court to correct its clearly erroneous interpretation of the purpose behind the enforced segregation laws and overrule Plessy. See id. at 495, 74 S.Ct. 686.
A less egregious example of precedent that was rightly discarded is Dr. Miles Medical Co. v. John D. Park & Sons Co. In Dr. Miles, the *180 Supreme Court held that vertical price agreements between a manufacturer and its distributors were per se antitrust violations. 220 U.S. 373, 407-08, 31 S.Ct. 376, 55 L.Ed. 502 (1911). The Court reasoned that such vertical agreements were economically analogous to unlawful horizontal agreements among competing distributors because vertical agreements always tended to restrict competition and decrease output. Id. at 408, 31 S.Ct. 376. Nearly a century later, though, the Supreme Court recognized the "differences in economic effect between vertical and horizontal agreements, differences the Dr. Miles Court failed to consider.” Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 889, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007). With the “economic literature [] replete with procompetitive justifications” for vertical price agreements between manufacturers and distributors, the Supreme Court properly overruled Dr. Miles. Id.