IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert S. Fadzen, Jr.,     :
            :
      Appellant  :
            :
     v.     : No. 50 C.D. 2018
            : Argued:  October 15, 2018
Pittsburgh Public School  :
District        :

BEFORE:  HONORABLE P. KEVIN BROBSON, Judge
       HONORABLE MICHAEL H. WOJCIK, Judge
       HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK        FILED:  April 4, 2019


Robert S. Fadzen, Jr. (Fadzen) appeals the December 8, 2017 order of the Court of Common Pleas of Allegheny County (trial court), which affirmed its prior order upholding the Board of Public Education of the School District of Pittsburgh's (Board) decision to terminate Fadzen from his position as Chief of School Safety.  We affirm.


**I.  Background**

At all relevant times, Fadzen was employed by the Pittsburgh Public School District (District) as Chief of School Safety.  Board's Finding of Fact (F.F.)

No. 3.[1]  On July 22, 2011, two NorthWest EMS (NW EMS) employees, Raul Sidhu and Emma Shaul, were commuting by ambulance back to the NW EMS base in McKees Rocks, Pennsylvania, after completing a hospital transport.  F.F. Nos. 45-46.  As they entered the downtown Pittsburgh area, Sidhu, the driver, made consecutive wrong turns onto Tenth Street and Fort Duquesne Boulevard.  F.F. No. 47.  To correct this mistake, Sidhu and Shaul agreed to briefly engage the emergency lights to safely execute a U-turn onto Fort Duquesne Boulevard.  F.F. No. 48.  Sidhu made this U-turn directly in front of Fadzen, who was driving a white SUV in the opposite direction.[2]  F.F. No. 49.

Fadzen began to closely follow Sidhu and Shaul and attempted to peer inside the cab of the ambulance.[3]  F.F. No. 50.  After some time, Fadzen engaged his emergency lights and conducted a traffic stop just before the West End Bridge

---

[1] Fadzen is also licensed to practice law in the Commonwealth of Pennsylvania.  F.F. No. 9.

[2] After executing the U-turn, Sidhu disengaged the emergency lights and allowed the other vehicles that had pulled over to pass him.  F.F. No. 48.

[3] At the public hearing, Sidhu testified that after he executed the U-turn, Fadzen pulled up next to the ambulance, glared at him and mouthed words angrily toward him and Shaul, yelled and clenched the steering wheel, and appeared to be enraged.  F.F. No. 50.  Sidhu stated that Fadzen approached the ambulance wearing a white polo-shirt without insignia and that Fadzen did not produce credentials exhibiting any authority to execute the traffic stop.  F.F. Nos. 58, 59.  Sidhu testified that Fadzen spoke at a loud volume and interacted with him and Shaul aggressively, both in words and in body language.  F.F. No. 53.  Sidhu said that Fadzen was extremely angry, profane, and relatively out of control.  *Id*.

Shaul's testimony corroborated Sidhu's testimony.  She also stated that Fadzen followed the ambulance so closely that they would have been rear-ended had they needed to come to a quick stop.  F.F. No. 54.  Shaul testified that Fadzen yelled profanities and obscenities, and threatened to revoke Sidhu's license and pursue further action by obtaining a warrant.  F.F. No. 57.

exit.  F.F. Nos. 50, 55.  Fadzen, who was not in uniform, identified himself as a City of Pittsburgh (City) police officer.  F.F. No. 58.  While executing the traffic stop, Fadzen used profane and offensive language; displayed aggressive mannerisms; and behaved inappropriately and unprofessionally.  F.F. Nos. 56, 57.

After the traffic stop, Fadzen phoned the NW EMS base, spoke with shift supervisor, Kevin Early, and reported that he had pulled over two employees for executing an illegal U-turn with the emergency lights engaged.[4]  F.F. Nos. 60-61, 70-71.  While speaking with Early, Fadzen again used profanity, identified himself as a City police officer, was inappropriate and unprofessional, and also threatened to revoke Sidhu's driving license and issue other citations.[5]  F.F. Nos. 68-74.

Upon learning of the traffic stop, George Dudash, NW EMS owner, investigated the incident and interviewed Sidhu, Shaul, and Early.  F.F. Nos. 77-82.[6,7]  On July 25, 2011, Dudash submitted a letter, with incident reports from Sidhu, Shaul, and Early, to the Superintendent of Pittsburgh City Schools, Dr.

---

[4] Sidhu and Shaul also phoned the NW EMS base to report the incident and spoke with a dispatcher while Early was on the phone with Fadzen.  F.F. Nos. 62, 75.

[5] Early testified that although Fadzen initially appeared to be rational, Fadzen became increasingly irate and aggressive.  F.F. Nos. 68-69, 72.  Early stated that by the end of their conversation, Fadzen was yelling and Early could barely understand him.  F.F. No. 73.

[6] NW EMS employees discovered by internet research that Fadzen was actually a *school* police officer and reported this information to Dudash.  F.F. No. 83.

[7] Dudash testified that Sidhu and Shaul both seemed frightened by Fadzen's behavior after the traffic stop.  F.F. No. 81.  Dudash stated that Fadzen's reaction seemed over-the-top, especially considering the minor infraction of making a U-turn with emergency lights engaged.  F.F. No. 85.

Linda Lane. F.F. Nos. 84-85. In the letter, Dudash expressed concern for Fadzen's "road rage" behavior during the traffic stop and suggested the possibility of Fadzen attending anger management classes. F.F. No. 27. Upon receipt of this letter, the District hired Gretchen Love, Esq., and the firm of Campbell, Durrant, Beatty, Palombo & Miller, P.C., to conduct an independent investigation of the incident. F.F. Nos. 31-32. In the course of this investigation, Attorney Love interviewed all persons involved in the traffic stop and gathered extrinsic evidence to support or refute the allegations made in Dudash's July 25 letter. F.F. No. 33.

## A. District Meetings and Charges

On September 16, 2011, Attorney Love and Director Jody Spolar, the District's Executive Director of Employee Relations and Organizational Development, interviewed Fadzen to obtain his version of the events. F.F. No. 90. Fadzen participated in the meeting with his union representative, *id.*, and admitted to pulling over the NW EMS ambulance on July 22, 2011, and contacting Early afterwards, but denied acting in the inappropriate manner alleged in Dudash's letter. F.F. Nos. 94-95.

Fadzen stated that when he first noticed the ambulance, he was sitting in a school safety SUV parked at the local high school on Fort Duquesne Boulevard. F.F. Nos. 91, 93. Fadzen explained that he was studying traffic patterns at the direction of Board member Mark Brentley when he observed the ambulance driving erratically. F.F. Nos. 92, 94. He stated that he conducted a textbook traffic stop and that he was extremely polite and extremely respectful when interacting with the NW EMS employees. F.F. No. 94. Fadzen denied using threatening or profane language, misrepresenting himself as a City police officer,

4

or being out of uniform at the time of the traffic stop. *Id.* Specifically, Fadzen said that he could not have lost his temper with the NW EMS employees because he had a medical condition and a history of health problems. F.F. No. 100. He also claimed that a few days after the traffic stop, an unknown caller from NW EMS contacted him and asked that he "go easy" on Sidhu. F.F. No. 96. Fadzen did not document the results of his traffic study, the traffic stop, or any phone calls that he received after the incident. F.F. Nos. 98-99. Following the meeting, Fadzen was suspended without pay while the District continued its investigation. F.F. No. 101.

Shortly thereafter, Fadzen hired counsel and then disputed the date of the incident. F.F. No. 102. On October 26, 2011, Fadzen was afforded a second meeting to clarify this inconsistency, which again was also attended by Attorney Love, Director Spolar, and Fadzen's counsel. F.F. No. 128. At the meeting, Fadzen claimed that the traffic stop could not have occurred at the time or date previously alleged because he was seeking treatment at the hospital during that time.[8] F.F. No. 129. Fadzen stated that on July 22, he went to lunch with his son around 1:30 p.m., drove himself home once he began to feel ill, and rested at home until driving himself to the hospital around 4:00 p.m. or 4:30 p.m. *Id.* Fadzen did not notify anyone that he was leaving work early on July 22 or report any sick days in July. F.F. No. 130.

To determine the correct chain of events, Attorney Love reviewed cell phone records, NW EMS records, Allegheny County emergency dispatch records, and District employee sick records. F.F. No. 110. The investigation revealed that on July 22, 2011, Fadzen observed the NW EMS ambulance make a U-turn around

---

[8] Fadzen also provided unprompted details of his personal medical history that led to his July 22 hospital visit. F.F. No. 129.

4:40 p.m.; pursued the ambulance and conducted a traffic stop around 4:55 p.m. to 5:00 p.m.; called information for NW EMS's dispatch number at 5:03 p.m.; called the NW EMS dispatcher at 5:07 p.m.; drove to the hospital; and called his wife once he had arrived at the hospital at 5:32 p.m. F.F. No. 121.

The investigation into the July 22 traffic stop also revealed that Fadzen had a history of excessive use of his authority as Chief of School Safety. F.F. No. 144.[9] The Board summarized this history as follows.

On September 18, 1997, Fadzen conducted an illegal search outside of school property. F.F. No. 147. The criminal case involving the search was appealed to our Superior Court, which held that Fadzen did not have policing authority outside of school property. *Id.* *See Commonwealth v. Williams*, 749 A.2d 957, 963 (Pa. Super. 2000).

On March 1, 2000, Fadzen brought several unarmed school police officers to "assist" in stopping a mass shooting in Wilkinsburg, Pennsylvania, outside of school property. F.F. No. 149. By written reprimand, the then-District superintendent warned Fadzen that he did not have police authority beyond school boundaries without first obtaining her explicit permission. F.F. Nos. 150-51.

On March 26, 2002, Fadzen received a second directive from the District's then-solicitor stating that although Board policy authorized school police officers to operate within 1,000 yards of school property, Section 778 of the Public

---

[9] Throughout these proceedings, Fadzen insisted that his police authority extended to within 1,000 yards of school property. F.F. No. 145.

6

School Code of 1949 (Public School Code)[10] only granted school police officers the authority to act on school property.  F.F. No. 156.

---

[10] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §7-778 (repealed).  The repealed Section 778 of the Public School Code in effect at the time of Fadzen's actions herein formerly stated, in relevant part:

> (a) Any school district may apply to any judge of the court of common pleas of the county within which the school district is situated to appoint such person or persons as the board of directors of the school district may designate to act as school police officer for said school district.  The judge, upon such application, may appoint such person . . . to be such school police officer and shall note the fact of such appointment to be entered upon the records of the court.  The judge may, at the request of the school district, grant the school police officer the power to arrest as provided in subsection (c)(2), the authority to issue citations for summary offenses or the authority to detain students until the arrival of local law enforcement, or any combination thereof.
>
> * * *
>
> (c) Such school police officer so appointed shall severally possess and exercise all the following powers and duties:
>
> (1) To enforce good order in school buildings, on school buses and on school grounds in their respective school districts . . . .
>
> (2) If authorized by the court, to exercise the same powers as are now or may hereafter be exercised under authority of law or ordinance by the police of the municipality wherein the school property is located.
>
> (3) If authorized by the court, to issue summary citations or to detain individuals until local law enforcement is notified.
>
> (d) Such school police officer shall, when on duty, severally wear a metallic shield or badge with the words "School Police," and the name of the district for which appointed.  Such shield shall always

**(Footnote continued on next page…)**

On May 17, 2005, Fadzen was sitting in the driveway of his residence, when a speeding car drove past him. F.F. No. 158. Fadzen pulled the car over in Greentree, Pennsylvania, and took possession of the driver's credit card and other items but did not return them. F.F. No. 159. Fadzen mailed the driver three citations, but failed to cite any supporting authority. F.F. No. 160. Fadzen did not

---

**(continued…)**

be worn in plain view when on duty except when employed as detective.

24 P.S. §7-778. *See now* Section 1302-C of the Public School Code, added by the Act of June 22, 2018 P.L. 327, 24 P.S. §13-1302-C.

As this Court has explained:

Under [the former] Section 778 of the School Code, 24 P.S. §7–778 [(repealed)], the trial judge does not approve the creation of a school police force but approves the appointment of each police officer "as he may deem proper" that a school district desires to employ. It also allows the school district various options as to the powers that each school police officer has from only allowing that person to "enforce good order" [under repealed Section 778(c)(1), 24 P.S. §7-778(c)(1) (repealed),] to give a school police officer full police powers [under repealed section 778(c)(2), 24 P.S. §7-778(c)(2)(repealed)], or somewhere in between by limiting the police officer's powers to issuing summary citations only, similar to powers of a code enforcement officer and, for other crimes, detain them until local law enforcement arrives. Section 778(c)(3) of the School Code, 24 P.S. §7-778(c)(3)[(repealed)]. Presumably, a school district would make that request based on the scope of powers that a school district wants all of its police officers to have. The trial court decides whether it is "proper" for that individual to serve as a school police officer within the powers the school district proposes for that person to have.

*In re Gateway School District*, 154 A.3d 886, 890 (Pa. Cmwlth. 2017).

8

document or report the traffic stop to anyone at the District. F.F. No. 164. On appeal, a magisterial district judge dismissed the citations based on Fadzen's lack of authority beyond school property. F.F. Nos. 161-62. The driver subsequently filed a lawsuit against Fadzen and the District for malicious prosecution and false arrest. F.F. No. 163. In 2007, the District's then-solicitor learned of the 2005 case and met with Fadzen and his union representative on October 26, 2007, to address Fadzen's lack of authority beyond school property and caution him, as the Chief of School Safety, from engaging in non-school related activities. F.F. Nos. 166, 167-78.

Thus, the investigation demonstrated that Fadzen was warned on numerous occasions that his authority did not extend beyond school property. F.F. No. 246. Fadzen was also warned about using profane and offensive language. F.F. No. 250. On June 18, 2009, after an altercation with a subordinate, Director Spolar issued a written reprimand prohibiting Fadzen from, among other things, using profane or offensive language, making threats, or engaging in other misconduct toward employees. F.F. No. 207.

The District completed its investigation of the July 22 incident and issued charges against Fadzen by November 14, 2011 letter. F.F. No. 13. The District concluded that Fadzen misused and exceeded his authority by executing the traffic stop, and did so in direct contravention of orders from his superiors. *Id*. The District emphasized that as a District employee, Fadzen is required to be truthful, but his account of the traffic stop varied significantly from the version of events as provided by the NW EMS employees, his own materially inconsistent statements at the two meetings, and the documentation gathered during the internal investigation. *Id*.

9

## B. Board Hearing

Fadzen appealed the District's charges to the Board and was represented by counsel at all relevant times. A hearing officer convened a hearing on behalf of the Board over eight sessions from January to March 2012, encompassing nearly 80 hours of testimony. F.F. Nos. 10, 15. Sidhu, Shaul, Early, and Dudash each testified that the traffic stop occurred on July 22, 2011, and that Fadzen behaved inappropriately. F.F. Nos. 50, 53-54, 57-59, 68-69, 72-73, 81-85.

Fadzen testified that the traffic stop could have occurred on July 20th or 21st, but not on July 22. F.F. No. 134. Fadzen admitted that he originally told Director Spolar and Attorney Love that the traffic stop occurred on July 22, but later remembered he had been at the hospital at that time. *Id.* By the time Fadzen testified, he realized that it would not have been possible to see the ambulance from where he claimed to have been sitting at the nearby high school. F.F. No. 137. At the hearing, Fadzen testified for the first time that he was walking on the Ninth Street Bridge when he first noticed the ambulance and that he walked over one-half block back to the high school to get to his SUV and initiate pursuit. F.F. Nos. 138-40.

Fadzen presented several witnesses to testify at the hearing: a District principal testified about his supervising relationship with Fadzen during the mid-1990s; Fadzen's son testified that his father left their lunch early on July 22 because he felt sick; Fadzen's neighbor testified that he observed Fadzen near his residence on the afternoon of July 22 and watched him leave later in the day in a white SUV; and the District's former Chief Financial Officer (CFO) testified regarding interactions between Director Spolar and Attorney Love during previous

investigations, and that Director Spolar had requested Fadzen's termination on numerous occasions before July 22. F.F. Nos. 226, 231-32, 235.

During the public hearing, Director Spolar and Attorney Love each testified that Fadzen's recount of the traffic stop differed greatly between the first and second meetings and that Fadzen was unable to resolve the discrepancy in his story.[11] F.F. Nos. 130-31, 136. In the course of the public hearings, two local citizens, Caroline Mitchell and Laura Hillock, who had previous interactions with Fadzen, volunteered their testimonies after reading about the current proceeding in the news. F.F. No. 170.[12]

Mitchell testified regarding an incident in April 2002, during which she temporarily maneuvered around an illegally double-parked car that was blocking the lane and was pulled over by Fadzen. F.F. Nos. 187-91. Mitchell stated that when she asked why he had pulled her over, Fadzen became visibly agitated, turned red, and started yelling. F.F. No. 192. Mitchell said that she was familiar with heart condition symptoms and became concerned that Fadzen's reaction would arouse a cardiac issue. F.F. No. 192.

Similarly, Hillock testified that in September 2005 she was involved in a minor traffic accident, following which Fadzen sped past her and jumped the curb in front of her; repeatedly told her to shut up; accused her of fleeing the scene when she was attempting to exchange information with the other driver; and

---

[11] Attorney Love stated that during their September 16 meeting, Fadzen shared that he had conducted thousands of traffic stops, which was of particular concern to her. F.F. No. 169.

[12] The Board considered Mitchell and Hillock's testimony only for the limited purpose of judging Fadzen's credibility, who maintained that he did not and would not act in the manner described by the NW EMS employees. F.F. No. 171.

11

threatened to arrest her. F.F. Nos. 176-79. Hillock described his behavior as outrageous, extremely inappropriate, hysterical, obnoxious, rude, and verbally threatening. F.F. No. 179.

## C. Board Decision

Ultimately, the hearing officer issued a decision setting forth the findings summarized above. The Board examined the hearing officer's findings and conducted an independent review of the record. By an August 22, 2012 order, the Board adopted the hearing officer's findings and concluded that Fadzen's behavior was unprofessional and unsuitable for the position of Chief of School Safety. Citing Fadzen's inconsistent statements, the Board found his testimony not credible. The Board accepted the testimony of NW EMS employees concerning the traffic stop, finding that the relevant events occurred on July 22 and that Fadzen had behaved in the inappropriate manner they had described. The Board credited the testimonies of both Mitchell and Hillock. The Board found that during the July 22 traffic stop, Fadzen misidentified himself as a City police officer, used profane and offensive language, lost his temper, and exhibited threatening and intimidating behavior.

The Board accorded *de minimis* weight to the testimony of Fadzen's witnesses, finding that they did not offer any testimony relevant to the July 22 incident, the investigation, or the charges. Specifically, the Board rejected the former CFO's testimony that Director Spolar was biased, noting, *inter alia*, that the former CFO was no longer employed by the District, he had exchanged information with Fadzen without the District's permission, and he took no efforts to document his allegations.

12

The Board determined that because the traffic stop was outside of school property and did not involve school students, Fadzen had exceeded the scope of his authority as Chief of School Safety in direct contradiction of instructions from numerous supervisors. The Board also noted that Fadzen's use of profanity when interacting with the NW EMS staff would be a sufficient basis alone for dismissal based on a past directive to refrain from using profane and vulgar language in the future.

The Board emphasized the particularly egregious nature of Fadzen's actions, considering that he had been reprimanded numerous times by District administrators, and his behavior as Chief of School Safety had created legal ramifications on more than one occasion. The Board stated that the totality of Fadzen's conduct provided further justification that the hearing officer's recommendation for dismissal was proper. The Board concluded that Fadzen's actions on July 22, 2011, demonstrating appalling, unprofessional, and inappropriate behavior, constituted sufficient basis to uphold his dismissal under Section 514 of the Public School Code.[13]

---

[13] Section 514 states, in pertinent part:

> The board of school directors in any school district, . . . shall after due notice, giving the reasons therefor, and after hearing if demanded, have the right at any time to remove any of its officers, employes, or appointees for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth, or other improper conduct.

24 P.S. §5-514.

## D. Trial Court Appeal

Fadzen filed a timely petition for review with this Court. However, by a September 28, 2012 order,[14] we denied the District's motion to dismiss and remanded the case to the trial court because the trial court, rather than this Court, had jurisdiction over Fadzen's appeal of the Board's decision pursuant to Section 933(a)(2) of the Judicial Code, 42 Pa. C.S. §933(a)(2).[15]

Before the trial court, Fadzen argued that the Board impermissibly delegated its authority to conduct the hearing to a hearing officer, and alternatively, if such delegation was permissible, that the Board erred in denying him the opportunity to voir dire the Board members. Fadzen also asserted that he had jurisdictional authority to issue the July 22, 2011 traffic stop.

On November 2, 2017, the trial court determined that the Board's findings were supported by substantial evidence. The trial court also relied on *Lewis v. School District of Philadelphia*, 690 A.2d 814, 817 (Pa. Cmwlth. 1997), to

---

[14] *Fadzen v. Pittsburgh Public School District* (Pa. Cmwlth. No. 1806 C.D. 2012, filed August 28, 2012).

[15] Section 5103(a) of the Judicial Code provides, in relevant part:

> If an appeal or other matter is taken to or brought in a court . . . of this Commonwealth which does not have jurisdiction of the appeal . . . the court . . . shall not quash such appeal or dismiss the matter, but shall transfer the record thereof to the proper tribunal of this Commonwealth, where the appeal or other matter shall be treated as if originally filed in the transferee tribunal on the date when the appeal. . . was first filed in a court . . . of this Commonwealth.

42 Pa. C.S. §5103(a).

determine that the Board had complied with Fadzen's due process rights. The court affirmed the Board's decision to terminate Fadzen's employment. Fadzen asked for reconsideration, arguing that the Board improperly delegated its authority, and requested a factual hearing on the merits.[16] However, by a December 8, 2017 order, the trial court affirmed its November 2, 2017 order, and Fadzen filed the instant appeal.[17]

## II. DISCUSSION

### A. Due Process

On appeal to this Court,[18] Fadzen first contends that the Board's appointment of a hearing officer for the task of conducting hearings was not

---

[16] Fadzen claimed that because the transcript was 3,106 pages in length and more than 250 exhibits were introduced, a hearing was necessary to resolve a serious question of fact. However, he does not point to a specific factual issue but, rather, argues that the Board's delegation to a hearing officer violated statutory authority and that he was entitled to an evidentiary hearing concerning whether the Board adequately reviewed the hearing officer's findings. As explained *infra*, this assertion is meritless.

[17] Fadzen also seeks to supplement the record with two documents: (i) his counsel's November 22, 2011 letter to Superintendent Dr. Lane, and (ii) an email submitted from the hearing officer to counsel for both parties. However, "[a]n appellate court is limited to considering only those facts that have been duly certified in the record on appeal. For purposes of appellate review, that which is not part of the certified record does not exist." *B.K. v. Department of Public Welfare*, 36 A.3d 649, 657 (Pa. Cmwlth. 2012) (citations omitted). We will not consider, and Fadzen may not supplement the certified record with, documents that were not made part of the record below. Nevertheless, we reject any assertion that his allegations of error have been waived and will consider his appellate claims on the merits.

[18] Our scope of review of a trial court's order affirming a school board's dismissal of an employee under Section 514 of the Public School Code is limited to considering whether constitutional rights were violated, whether the board committed an error of law, and whether the board's findings of fact are supported by substantial evidence. *School District of Philadelphia v. Puljer*, 500 A.2d 905, 907 (Pa. Cmwlth. 1985).

authorized by the Public School Code. We have previously considered whether such a delegation by the board to a hearing officer was an infringement upon an individual's due process rights.

In *Lewis*, a district administrator notified a custodian that his termination had been recommended to the school board. Two disciplinary hearings were held before two hearing officers concerning the proposed discharge. The school board adopted the hearing officers' findings and recommendations that the custodian be terminated due to improper conduct under Section 514 of the Public School Code. The custodian appealed to the common pleas court, which remanded to the board for an additional hearing to afford him an opportunity to address the ultimate fact-finding tribunal, the board.

On appeal, this Court observed that as a nonprofessional public school employee, the custodian had a property right in the expectation of continued employment and was entitled to procedural due process when being dismissed for cause. To determine the process that was due, we considered the processes of other Commonwealth agencies such as the Unemployment Compensation Board of Review, the State Employees' Retirement Board, and the Pennsylvania State Police. We noted that these agencies serve as the ultimate arbiters of fact; "[h]owever, the hearings are conducted by referees or fact-finding boards who make recommendations which the decision-making tribunals choose either to follow or to disregard." 690 A.2d at 817, n.13. We concluded that the board, like many other Commonwealth agencies, "has broad discretion to delegate to hearing officers the task of conducting hearings." *Id.* at 817. We ultimately held that a board satisfies the due process rights of a nonprofessional public school employee by:

16

> (1) appointing a hearing officer to hold a hearing at which Lewis was represented by counsel and had the opportunity to cross-examine witnesses; (2) reviewing the officer's findings of facts, conclusions of law and recommendation; and (3) making an independent ruling based on the entire record.

*Id.*[19]

In an attempt to distinguish this controlling precedent, Fadzen maintains that unlike the appellant in *Lewis*, his argument asserts a violation of statutory authority, not of due process rights. Fadzen argues that the Board was not authorized by Section 514 of the Public School Code to delegate the task of conducting hearings to a hearing officer. As stated above, Section 514, governing the removal of employees, provides that the Board has "the right at any time to remove" Fadzen "after due notice, giving the reasons therefor, and after hearing if demanded," based on "incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth, or other improper conduct." 24 P.S. §5-514.

Relying on Section 1318 of the Public School Code,[20] Fadzen argues that the Board only possesses this delegated authority in *student* misconduct

---

[19] In its analysis, the *Lewis* court also relied on this Court's opinion in *Puljer*, 500 A.2d at 905, where we upheld the dismissal of a school district employee in a case in which a board adopted the hearing officer's recommendation without conducting an additional hearing.

[20] 24 P.S. §13-1318. Section 1318, concerning the suspension and expulsion of students, provides:

> Every principal or teacher in charge of a public school may temporarily suspend any pupil on account of disobedience or misconduct, and any principal or teacher suspending any pupil shall promptly notify the district superintendent or secretary of the

**(Footnote continued on next page…)**

17

hearings. He contends that the absence of similar language in Section 514 indicates that the Board is only authorized to delegate to hearing officers the task of conducting hearings involving students, but not employees.[21] Fadzen maintains that absent express statutory authority under Section 514, the Board's delegation of hearing authority to a hearing officer was impermissible. We disagree.

Section 1318 of the Public School Code authorizes the Board to delegate to a hearing officer **both** the authority to conduct a hearing and the authority to decide whether or not to suspend or expel a student. By contrast, Section 514 of the Public School Code **only** authorizes the Board to delegate to a hearing officer the authority to conduct a hearing, and it is the Board, not the hearing officer, that makes the final decision of whether or not to terminate an employee. The Board is afforded greater delegation authority under Section 1318 of the Public School Code, but it is nonetheless permitted to delegate its authority to conduct a hearing to a hearing officer under Section 514 of the Public School Code.

We rejected a similar argument in *Kaczmarcik v. Carbondale Area School District*, 625 A.2d 126, 130 (Pa. Cmwlth. 1993). In that case, the appellant,

---

**(continued…)**

> board of school directors. The board may, after a proper hearing, suspend such child for such time as it may determine, or may permanently expel him. *Such hearings, suspension, or expulsion may be delegated* to a duly authorized committee of the board, *or to a duly qualified hearing examiner,* who need not be a member of the board, *but whose adjudication must be approved by the board.* (Emphasis added.)

[21] Fadzen states that this is likely because of the far greater number of students by comparison to employees in school settings.

18

a vice principal, was transferred to the position of teacher, which constituted a "demotion" under Section 1151 of the Pubic School Code, 24 P.S. §11-1151. The school board appointed a hearing officer to conduct a hearing and later voted to accept the hearing officer's recommendation that the appellant failed to prove that the demotion was arbitrary. The appellant argued that the appointment of a hearing officer to conduct hearings violated Section 1151, which states that, "such demotion shall be subject to the right to a hearing before the *board of school directors . . . .*" 24 P.S §11-1151 (emphasis added), and Section 1127, which provides that, a "*board . . . shall conduct a hearing . . .* where such professional employe will be given an opportunity to be heard either in person or by counsel, or both, *before the board of school directors.*" 24 P.S. §11-1127 (emphasis added).

Relying on *Acitelli v. Westmont Hilltop School District*, 325 A.2d 490 (Pa. Cmwlth. 1974), we considered both the board's and the appellant's involvement in the hearing. We found that the appellant had the opportunity to present evidence and cross-examine witnesses. Additionally, we noted that six board members attended the hearing, all nine members voted on the resolution, and a majority of the votes were in favor of adopting the hearing officer's recommendation. We determined that there was nothing to suggest that the board failed to conduct an independent review of the record and held that the appointment of a hearing officer was not in violation of the Public School Code or the appellant's due process rights.[22]

---

[22] In *Kaczmarcik*, this Court focused on the *number* of board members present at the hearing. We explicitly stated that we would not decide the issue of whether the delegation of hearing authority to a hearing officer was authorized when no board members attended the hearing. Rather, our analysis concerned whether the appointment of a hearing officer violated

**(Footnote continued on next page…)**

19

Alternatively, Fadzen argues that if the Board's delegation to a hearing officer was authorized by statute, he was entitled to voir dire each member concerning the Board's process of making an independent review of the hearing officer's findings. We rejected this argument in *Graham v. Mars Area School District*, 415 A.2d 924, 925 (Pa. Cmwlth. 1980), where a school district's physical education instructor asserted his right to voir dire board members at the public hearing concerning his dismissal. We recognized that voir dire serves to assist counsel in seating a fair and impartial jury and noted that the "differences between the process of selecting and the functions of juries on the one hand, and administrative agencies with quasi-judicial powers on the other are too plain to require our exposition." 415 A.2d at 926. This Court held that "[v]oir dire is not available to test members of administrative bodies engaged in adjudicated issues committed to their decision." *Id*.

---

**(continued…)**

the Public School Code or due process rights when each board member voted on the hearing officer's recommendation and a majority of board members were present at the hearing.

Here, Fadzen raised the issue of Board member hearing attendance before the trial court. In his application to supplement the record before this Court, he also argues that a quorum of board members are statutorily required to appear at the hearing; however, he fails to cite any authority to support this assertion. Unfortunately, because Fadzen did not raise this issue in his statement of errors on appeal, the issue is waived for our review under Pa.R.A.P. 1925(b)(4)(vii).

Notably, even if this issue was preserved on appeal, Fadzen's argument nonetheless would fail. In *Lewis*, we held that the board's delegation of hearing authority to a hearing officer is permissible as long as the board satisfies a three-part test to comply with an individual's due process rights. *Lewis* is silent as to any requirement that board members attend the hearing. Absent any statutory guidance on this issue, *Lewis*, which was decided several years after *Kaczmarcik*, is controlling.

20

While there is no recognizable statutory or constitutional right to voir dire board members, Fadzen contends that the denial of his voir dire request violated his due process rights under *Lewis,* which obligates the Board to conduct an independent review of the hearing officer's findings. However, Fadzen cites no evidence to support his contention that the Board failed to independently review the hearing officer's findings in the present matter.

Moreover, in determining whether an individual's employment should be terminated, the Board's review of matters such as previous knowledge and prior discussions concerning the individual's employment does not infringe upon the fairness of the members. 415 A.2d at 926. Rather, there must be a "great possibility" of "actual bias" for a violation of an individual's constitutional rights. *Department of Insurance v. American Bankers Insurance Company of Florida*, 387 A.2d 449, 455 (Pa. 1978) (finding that actual bias may be established by a "concrete showing of direct participation in prosecutorial and adjudicatory functions giving rise to inherent unfairness").

Here, Fadzen was present for the hearings in their entirety, represented by counsel at all relevant times, and had the opportunity to raise objections, testify, and present witnesses. Accordingly, Fadzen's due process rights were satisfied under *Lewis*. Absent a showing of "actual bias,"[23] we cannot

---

[23] Fadzen argued before the Board and the trial court that the charges against him were pretextual because the District had a preexisting goal of getting him fired and former Superintendent Mark Roosevelt, Director Spolar, and Attorney Love each harbored bias against him. Specifically, Fadzen stated that former-Superintendent Roosevelt wanted Fadzen terminated due to their different ideas about school policing and that Director Spolar and Attorney Love were prejudiced against him from previous internal investigations within the District. The Board, as the judge of credibility, did not credit any allegations of perceived bias by former-Superintendent Roosevelt, Director Spolar, or Attorney Love, and we will not disturb **(Footnote continued on next page…)**

21

find that the Board's denial of Fadzen's request to voir dire each board member violated his rights to due process.

## B. Merits of Board's Action

On the merits, Fadzen contends that the July 22, 2011 traffic stop was authorized under former Section 778 of the Public School Code, because he pulled over the NW EMS ambulance within 1,000 yards of school property. However, the relevant question before this Court is not whether Fadzen was within 1,000 yards of school property when conducting the July 22, 2011 traffic stop. Instead, we must determine whether substantial evidence supports the Board's finding that Fadzen was dismissed because his actions constituted "incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth, or other improper conduct." 24 P.S. §5-514.

The Board rejected Fadzen's testimony and accepted the NW EMS employees' and owner's rendition of the events surrounding the traffic stop. The Board found that Fadzen misidentified himself as a City police officer, acted in an unprofessional and inappropriate manner when speaking with the NW EMS employees, and ignored numerous directives from his superiors not to conduct police activity outside of school property. *See, e.g.*, *Williams*, 749 A.2d at 960-62 (holding that Fadzen and other school officers acted without authority under the former Section 778(c)(1) of the Public School Code when they opened a student's

---

**(continued…)**

this determination on appeal. *See Barhight v. Board of Directors of the Bradford Area School District*, 689 A.2d 327, 329 (Pa. Cmwlth. 1997) ("Credibility determinations are the sole province of the Board and may not be reviewed by this Court on appeal. *Hickey v. Board of School Directors of Penn Manor School District*, [328 A.2d 549 (Pa. Cmwlth. 1974)].").

22

vehicle which was parked on a city street, off school property, and searched its interior, seizing weapons and turning them over to City police, because they were only empowered to enforce order in school buildings, on school buses, and on school grounds, and they were not within these delineated areas when they conducted the search and seizure of student's vehicle).

The Board also found that in conducting the traffic stop, Fadzen violated a supervisory order to refrain from using profanity. Additionally, as Chief of School Safety, Fadzen was aware of an obligation to conduct himself with professionalism and decorum in public. As this Court has explained:

> The trial court's holding that improper conduct must occur on or about school property is wholly without foundation in the statutory language. No qualification is attached to the phrase "other improper conduct." The School Board has discretion in deciding what conduct is improper for its employees who act as adult models for school children. To limit this discretion because of the location or effect of the conduct is not reasonable, and is inconsistent with this Court's case law.
>
> We hold that whether improper conduct takes place on or off school property or whether it affects job performance is irrelevant. The only question presented to the Board was whether [the former employee's] possession of controlled substances constituted improper conduct. We hold that it did.

*School District of Philadelphia v. Puljer*, 500 A.2d 905, 907 (Pa. Cmwlth. 1985) (citation omitted).[24]

---

[24] *See also Barhight*, 689 A.2d at 329-330 (holding that a school district supervisor engaged in "improper conduct" under Section 514 by appropriating school district personnel services and resources for his personal use even where the school district had no specific rule prohibiting such conduct because the diversion of property and personnel services to his personal use was by definition wrongful).

Therefore, even if Fadzen had the enumerated authority under the repealed Section 778 of the Public School Code to conduct the July 22 traffic stop, his dismissal was nonetheless authorized under Section 514 of the Public School Code. We find that there is substantial evidence to support the Board's findings that Fadzen was dismissed from his position for neglect of duty, other improper conduct, and violation of the statute in effect at that time and the prior directives of his supervisors, under Section 514 of the Public School Code.

Accordingly, we affirm.

_____

MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert S. Fadzen, Jr.,                      :
                                            :
                    Appellant               :
                                            :
            v.                              :  No. 50 C.D. 2018
                                            :
Pittsburgh Public School                    :
District                                    :

## **O R D E R**

AND NOW, this 4<u>th</u> day of <u>April</u>, 2019, Robert S. Fadzen, Jr.'s application to supplement the record is hereby DENIED and the December 8, 2017 order of the Court of Common Pleas of Allegheny County is AFFIRMED.


_____
MICHAEL H. WOJCIK, Judge